1

2

3

4 **UNITED STATES DISTRICT COURT**

5 **EASTERN DISTRICT OF CALIFORNIA**

6

7 **GLENN ABRAHAMSON, an individual,**     **CASE NO. 1:16-CV-0348 AWI BAM**
   **JOSEPH WONG, an individual, and BB17,**
8 **LLC, a Wyoming limited liability company**

9            **Plaintiffs**                         **ORDER ON DEFENDANT'S RULE**
                                                     **12(b)(2) MOTION TO DISMISS FOR**
10           **v.**                                  **LACK FO PERONSAL JURISDICTION**
                                                     **AND ORDER ON DEFENDANT'S**
11 **BRAD BERKLEY, an individual,**                  **SLAPP MOTION TO STRIKE**

12           **Defendant**                           (Docs. No. 10, 11)

13

14        This case stems from a business relationship between Plaintiffs Glenn Abrahamson

15 ("Abrahamson"), Joseph Wong ("Wong"), and BB17, LLC ("BB17") (collectively "Plaintiffs")

16 and Defendant Brad Berkley ("Berkley").  In the First Amended Complaint ("FAC"), Plaintiffs

17 allege claims under California law for breach of fiduciary duty, tortious interference with

18 prospective business relations, unfair competition under California Business Code § 17200,

19 malicious prosecution, and conspiracy.  Berkley now moves under Federal Rule of Civil

20 Procedure 12(b)(2) for dismissal due to lack of personal jurisdiction, and also moves to strike

21 under California Code of Civil Procedure § 425.16 (the "strategic lawsuits against public

22 participation act" ("SLAPP")).  For the reasons that follow, Berkley's Rule 12(b)(2) motion will

23 be granted in part and denied in part, BB17 and Wong will be dismissed, and Berkley's SLAPP

24 motion will be denied.

25

26                                    **BACKGROUND**

27        From the FAC and the declarations submitted by the parties, see Doc. Nos. 6, 11, 15,

28 Abrahamson is a citizen of California and Berkley is a citizen of Texas.

1   Berkley is a principal of Base4 Group, Inc. ("Base4"), a Texas corporation whose activities

2   include product distribution.  Around 2005, Berkley met with Abrahamson in Los Angeles to

3   discuss the possibility of a business venture in which Abrahamson, who is an experienced creator

4   and marketer of personal care products, would oversee the design of such products and Base4

5   would distribute them.  During the meeting, Berkley stated that he wanted to personally enter into

6   a business relationship with Abrahamson, but could not do so because he was under a non-

7   competition agreement that stemmed from the recent sale of a portion of Base4 to a separate

8   entity.  However, Berkley explained that his close friend Mark Parker ("Parker") was interested in

9   participating in a partnership with Abrahamson.  Berkley allegedly intended to circumvent the

10  non-competition agreement through the business relationship between Abrahamson and Parker.

11  After additional meetings in Los Angeles, Abrahamson, Parker, and Berkley agreed that

12  Abrahamson and Parker would form a limited liability company which would design, create, and

13  manufacture personal care products, and that Base4 would be the distributor of those products.

14  In 2006, Abrahamson and Parker created Wink Bath & Body, LLC ("Wink").  Wink was

15  organized under the laws of Nevada, and Parker and Abrahamson were Wink's co-managers and

16  only two members.  Wink's purpose was to design and sell personal bath and body care products

17  through a large number of retail outlets in California. Base4 also was to provide administrative

18  support for Wink.

19  In July 2008, Abrahamson and Wong formed BB17, a wholesale distributor.  BB17 was

20  initially formed as a limited liability company in Nevada, but was reorganized as a Wyoming

21  limited liability company in 2015.  BB17 sold personal care products that arguably appear to be

22  similar to Wink's products.  See Chang Dec. Ex. C; see also Nowell Dec. ¶ 8.

23  In January 2013, Abrahamson presented to nationwide retailer Target a line of Wink

24  products named "spa perfect."  Target was impressed with Abrahamson's presentation and agreed

25  to place Wink's "spa perfect" products in stores throughout the nation, including the Central

26  Valley of California.  Further, by the holiday season of 2013, Wink sold its "One" line of products

27  in retail stores throughout the nation, including the Central Valley of California.  The packaging

28  design and artwork for "spa perfect" was designed by Abrahamson's wife, Suzanne Abrahamson,

1  who gave Wink a limited nontransferable license to use her artwork in exchange for the payment

2  of royalties.  Abrahamson also obtained a limited nontransferable license from graphic design

3  artist Gail Onstad, for use in Wink's "One" product line.

4        Berkley, Parker, and Base4 agreed to carry out a plan to usurp Wink's resources and harm

5  Abrahamson.  Berkley, Parker, and Base4 made false statements to retail distributors (including

6  Walgreens, Target, and Big Lots) that personal care products offered by BB17 were dangerous and

7  unfit for human use and consumption.  Berkley, Parker and Base4 knowingly gave false

8  information to retailers that Plaintiffs had circumvented FDA approval for BB17 products.  Also,

9  Wink's tax returns listed the corporation B-King, Inc. (an entity owned and controlled by Berkley,

10  Base4, and Berkley's father) as a "creditor."  From 2006 to 2014, Wink's tax returns indicated that

11  Wink had incurred and completely repaid a liability of $229,000 to B-King, Inc., that Wink had

12  incurred and completely repaid $235,274 in liability to Base4, and that Wink had incurred

13  $500,000 in liability to Berkley's father, but had only repaid $50,000.00.  However, the payments

14  made by Wink to B-King, Base 4 and Berkley's father were not made in exchange for any

15  valuable consideration.  Instead, the payments were made pursuant to the plan to injure

16  Abrahamson financially by appropriating Wink's assets.  Abrahamson was sent a copy of Wink's

17  tax returns at his California residence.

18        In August 2013, in order to intimidate and injure Plaintiffs, Berkley knowingly presented

19  false information to the Dallas division of the Federal Bureau of Investigation ("FBI").  Berkley

20  falsely represented that Abrahamson was an employee of Base4, that the Plaintiffs through BB17

21  were engaged in fraudulent and illegal conduct toward Base4 (including use of proprietary

22  artwork), and that BB17's products were dangerous and unfit for human use.[1]  Abrahamson was

23  not an employee of Base4 and the artwork at issue remained the property of the artists.

24  _____

25  [1] In a reply declaration in support of the SLAPP motion, Berkley denies saying that the BB17 were dangerous.  See
Berkley Reply Dec. ¶ 4.  Plaintiffs did not respond to this reply declaration.  Under Rule 12(b)(2), unrebutted claims
in a declaration are accepted as true.  Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d 1218, 1223 (9th Cir. 2011).

26  However, as explained, the denial is contained in a reply declaration, so Plaintiffs did not have an adequate
opportunity to respond to it.  Berkley's denial is relevant to issues in both the Rule 12(b)(2) and SLAPP motions.  If

27  Berkley intended for the Court to consider his denial, then he should have submitted it as part of his initial moving
papers so that Plaintiffs could have had a fair opportunity to respond.  Because Berkley's denial was made as part of a
reply and Plaintiffs have not a fair opportunity to respond, the Court will not consider the denial.  Zamani v. Carnes,

28  491 F.3d 990, 997 (9th Cir. 2005); Eberle v. Anaheim, 901 F.2d 814, 818 (9th Cir. 1990).

As a result of Berkley's false statements, the FBI obtained a search warrant. The search warrant application states that it is made in furtherance of an investigation into the crimes of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to commit mail and wire fraud (18 U.S.C. § 1349). See Chang Dec. Ex. B at p.1. Under a section entitled "Summary of Probable Cause," the search warrant application summarized probable cause as follows:

> From about July 2008 through the present, Abrahamson, while employed by Base4, and Joseph Wong, agreed to devise and did devise a scheme and artifice to defraud Base4 by stealing the artwork and designs of Base4 product packaging, as well as the ingredient composition for Base4 products, using them to manufacture virtually identical products, and selling them to general merchandise retailers in lieu of Base4 products. Abrahamson made materially false statements to Base4 claiming that he was selling Base4 products to general merchandise retailers, when he was actually selling BB17 products; Abrahamson also made materially false representations to the general merchandise retailers by representing on product packaging that the BB17 products were FDA-approved. In execution of the scheme to defraud Base4, Abrahamson and Wong caused interstate commercial carriers to deliver products throughout the United States and into the Eastern District of Texas, and caused wire transmissions to occur between China and locations in the United States and California.

Id. at ¶ 5.

Pursuant to the search warrant, in August 2013 the FBI and local law enforcement raided Abrahamson's personal residence in California. Law enforcement officials seized Abrahamson's personal computers and personal property, as well as product samples and documents necessary for BB17's effective business operations. The loss of business related documents and materials resulted in financial injury to Abrahamson.

In October 2013, Base4, Wink, and Parker filed a lawsuit in Dallas County, Texas against Abrahamson and BB17. The Texas lawsuit includes causes of action relating to a scheme by Plaintiffs to defraud Base4, including Plaintiffs stealing artwork and designs of Base4 in order to create infringing products, which were distributed by BB17. The lawsuit also alleges that Abrahamson was an employee of Base4 who was hired to sell Wink products. The lawsuit was stayed pending resolution of the criminal investigation against Abrahamson.

Prior to Christmas 2013, Berkley, Parker, and Base4 appropriated and duplicated Wink's products logo, design, artwork, and packaging for the purpose of usurping Wink's opportunity to sell the "spa perfect" and "One" line of products. Since the holiday season of 2013, Berkley,

Parker, and Base4 have sold their duplicate versions of "spa perfect" and "One" to customers nationwide, including customers in the Central Valley of California.

The FBI eventually referred the matter to United States Attorney's Offices for the Northern District of Texas and the Eastern District of Texas. Both offices declined to pursue a criminal prosecution.

**DEFENDANT'S MOTIONS**

**I.**      **Rule 12(b)(2) -- Personal Jurisdiction**

*Legal Framework*

The plaintiff bears the burden of establishing that personal jurisdiction is proper. Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d 1218, 1223 (9th Cir. 2011); Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir. 2004). Where a defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss. Mavrix Photo, 647 F.3d at 1223; Schwarzenegger, 374 F.3d at 800. Although plaintiffs cannot "simply rest on the bare allegations of [their] complaint," uncontroverted allegations in the complaint must be taken as true. Mavrix Photo, 647 F.3d at 1223; Schwarzenegger, 374 F.3d at 800. Courts do not assume the truth of allegations in a pleading which are contradicted by affidavit, but courts do resolve factual disputes in the plaintiff's favor. Mavrix Photo, 647 F.3d at 1223.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." Daimler AG v. Bauman, 134 S.Ct. 746, 753 (2014); Picot v. Weston, 780 F.3d 1206, 1211 (9th Cir. 2015). Since the California "long-arm statute" permits the exercise of personal jurisdiction to the full extent permitted by the U.S. Constitution, a court's personal jurisdiction inquiry centers on whether exercising jurisdiction comports with due process. Daimler, 134 S.Ct. at 753; Picot, 780 F.3d at 1211. In order for a state to exercise personal jurisdiction over a nonresident, the "nonresident generally must have certain minimum contacts with the forum so that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Picot, 780 F.3d at 1211.

Specific jurisdiction focuses on "the relationship among the defendant, the forum, and the litigation," and the "defendant's suit-related conduct must create a substantial connection with the forum State." Walden v. Fiore, 134 S.Ct. 1115, 1121 (2014).  The Ninth Circuit utilizes a three part test to determine whether specific jurisdiction exists:  (1) the non-resident must purposefully direct his activities or consummate some transaction with the forum or resident thereof;[2] (2) the claim must be one which arises out of or relates to the defendant's forum-related activities, and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.  Picot, 780 F.3d at 1211; Schwarzenegger, 374 F.3d at 802.  The plaintiff bears the burden of proving the first two prongs, but if the plaintiff is successful, the burden then shifts to the defendant to make a "compelling case" that the exercise of jurisdiction would be unreasonable. Picot, 780 F.3d at 1211-12; Mavrix Photo, 647 F.3d at 1228.  Personal jurisdiction must exist for each claim asserted.  See Picot, 780 F.3d at 1211.  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law."  In re W. States Wholesale Natural Gas Antitrust Litig., 715 F.3d 716, 742 (9th Cir. 2013).

With respect to the first prong ("purposeful direction"), courts utilize the three-part "effects test."  Picot, 780 F.3d at 1213; Schwarzenegger, 374 F.3d at 803.  Under the effects test, there is "purposeful direction" by a non-resident defendant if he:  (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that he knows is likely to be suffered in the forum state.  Picot, 780 F.3d at 1214; Schwarzenegger, 374 F.3d at 803.  An "intentional act" is "an external manifestation of the actor's intent to perform an actual, physical act in the real world, not including any of its actual or intended results."  In re W. States, 715 F.3d at 743 n.25. Conduct is "expressly aimed" at a forum if the conduct "directly targets" the forum.  Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1129 (9th Cir. 2010).  The "express aiming" analysis "depends to a significant degree on the specific type of tort or other wrongful conduct at issue."  Picot, 780 F.3d at 1206; Schwarzenegger, 374 F.3d at 807.  However, courts are "limited to 'the defendant's suit-related conduct.'"  Picot, 780 F.3d at 1215 n.3 (quoting

---

[2] For contract claims, the first prong is "purposeful availment."  See Picot, 780 F.3d at 1212.  Because tort claims are at issue in this case, the Court confines its analysis to "purposeful direction."  See id.; see also Footnote 3, *infra*.

1   Walden, 134 S.Ct. at 1121).  Courts must look "to the defendant's contacts with the forum State

2   itself, not the defendant's contacts with persons who reside there."  Walden, 134 S.Ct. at 1122;

3   Picot, 780 F.3d at 1214.  "[T]he plaintiff cannot be the only link between the defendant and the

4   forum," and a "mere injury to a forum resident is not a sufficient connection to the forum."

5   Walden, 134 S.Ct. at 1122, 1125; Picot, 780 F.3d at 1214.  "The proper question is not where the

6   plaintiff experienced a particular injury or effect but whether the defendant's conduct connects

7   him to the forum in a meaningful way."  Walden, 134 S.Ct. at 1125; see also Picot, 780 F.3d at

8   1214.  Finally, while there must be foreseeable harm in the forum, the bulk or brunt of the harm

9   need not be suffered in the forum, rather it is sufficient if the defendant's "conduct caused harm

10  that it knew was likely to be suffered in the forum."  Brayton Purcell, 606 F.3d at 1131.

11          With respect to the second prong ("arising out of or relating to"), the Ninth Circuit refers to

12  this prong as the "but for" test.  In re W. States, 715 F.3d at 742.  Under the second prong, "a

13  lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between

14  those contacts and the cause of action."  Id.  That is, a plaintiff must show that "but for" the

15  defendant's forum related conduct, the injury would not have occurred.  Myers v. Bennett Law

16  Offices, 238 F.3d 1068, 1075 (9th Cir. 2001).

17          With respect to the third prong ("reasonableness"), the Ninth Circuit considers seven

18  factors:  (1) the extent of the defendant's purposeful interjection into the forum state, (2) the

19  burden on the defendant in defending in the forum, (3) the extent of the conflict with the

20  sovereignty of the defendant's state, (4) the forum state's interest in adjudicating the dispute, (5)

21  the most efficient judicial resolution of the controversy, (6) the importance of the forum to the

22  plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum.

23  In re W. States, 715 F.3d at 745; Dole Food Co. v. Watts, 303 F.3d 1104, 1114 (9th Cir. 2002).

24          *Defendant's Argument*

25          Berkley argues that Plaintiffs cannot establish personal jurisdiction because there is no

26  express aiming.  The fiduciary shield doctrine protects a business's officers.  Each of the FAC's

27  allegations against Berkley relate to the business of Base4, Wink, and BB17.  Berkley contends

28  that he engaged in business contacts with California on behalf of Base4 to establish a business

7

1  relationship with Wink, which is co-managed by Abrahamson.  The FAC only places Berkley in

2  California for preliminary meetings in 2005.  Each of the alleged tortious acts by Berkley occurred

3  in Texas.  Berkley argues that although Base4's distribution with Wink presumably resulted in

4  shipping Wink's products to California, Berkley intended that Base4 distribute Wink products

5  nationwide.  Because of the fiduciary shield doctrine, Plaintiffs cannot establish that Berkley

6  purposefully availed himself to California, or that his non-official conduct gave rise to this case.

7      Alternatively, Berkley argues that exercising personal jurisdiction would offend notions of

8  fair play and substantial justice.  There are no allegations in the FAC that Berkley had contacts

9  with California in his personal capacity.  Further, while Abrahamson, BB17, Base4 and Wink are

10  actively pursuing litigation in Texas, Berkley alone is being hailed into California to face

11  Plaintiffs' claims, even though they arise out of the same set of facts and circumstances as the

12  Texas litigation.

13      *Plaintiffs' Opposition*[3]

14      Plaintiffs argue that there is personal jurisdiction.  Initially, Plaintiffs argue that the

15  fiduciary shield doctrine does not apply.  Contrary to Berkley's arguments, the Supreme Court and

16  California courts judge an individual's actions and contacts, even if those acts were purportedly

17  done in an official business capacity.

18

19      Aside from the fiduciary shield doctrine, Plaintiffs argue that there is personal jurisdiction.

20  First, there was purposeful direction by Berkley.  Berkley engaged in a number of intentional acts

21  by siphoning funds from Wink, misappropriating and selling Wink's artwork for his own benefit,

22  falsely reporting to retailers that BB17's products were harmful, and falsely reporting to the FBI

23  that Abrahamson was an employee of Base4, that Abrahamson and BB17 used such employment

24  to defraud him (Berkley) by utilizing artwork that he owned, and that BB17's products were

25  unsafe for human use.  Next, Berkley expressly aimed his conduct at California.  Berkley knew

26

27

28

[3] Plaintiffs argue that some of Berkley's contacts indicate "purposeful availment."  In analyzing personal jurisdiction, "purposeful direction" and "purposeful availment" are distinct concepts.  See Picot, 780 F.3d at 1212.  Claims sounding in contract are generally analyzed using the "purposeful availment" test, while claims sounding in tort are analyzed under the "purposeful direction" test.  Id.  Because the claims at issue in this case are all torts, the Court will confine its analysis to "purposeful direction."  See id.; see also Footnote 2, *supra*.

that Abrahamson lived and operated in California, and he used Parker's position as co-managing

partner of Wink to siphon Wink's funds through phony debts.  Berkley and Parker then listed such

phony debts on Wink's tax returns, which were delivered to Abrahamson's in California.  This

was done to harm Abrahamson in California, and supplies a basis for personal jurisdiction for the

first cause of action.  Also, Berkley's use of Parker's relationship to usurp Wink's resources and

produce duplicate competing goods in markets nationwide (including California) provides a basis

for personal jurisdiction for the first three causes of action.  Berkley's false statements to retailers

were designed to injure Plaintiffs' business in California, and he was aware that Abrahamson was

a member of BB17 and that Abrahamson conducted business on behalf of BB17 out of California.

Berkley's statements were designed to weaken and inflict financial harm to Plaintiffs by striking at

their operational situs in the United States, while at the same time using the usurped Wink

resources to increase his own profits in California.  Also, Berkley's false statements to the FBI

were designed to effect the institution of criminal proceedings against Abrahamson at his home in

California.  Finally, there was foreseeable harm.  For 7 years while Berkley worked with

Abrahamson, Abrahamson worked out of his California residence.  Berkley knew that the harm

suffered by Abrahamson would occur in California.  Berkley also knew that BB17 operated

nationwide and sought to achieve sales in California.

Second, the "but for test" is met.  Had Berkley not taken Wink's money or resources, made

false representations to retailers, and made false representations to the FBI concerning Plaintiffs,

the claims at issue would have never arisen.  Further, if Berkley had not travelled to California to

instigate the business relationship, the ensuing tortious conduct would not have occurred.

Third, Berkley cannot show that exercising personal jurisdiction over him in California is

unreasonable.  The extensive number and frequency of Berkley's contacts, the use of California as

the site of negotiation and formation of the business relationship, the approximately 7 year

commercial relationship that was maintained through California contacts, the tortious and

intentional nature of Berkley's California directed conduct, Berkley's involvement of California

law enforcement weigh in favor of retaining jurisdiction, and the location in California of

Abrahamson, his wife, and the law enforcement officers involved in the raid, all indicate that

1    exercising personal jurisdiction in California is reasonable.

2    *Discussion*

3    1.    Fiduciary Shield/Corporate Shield

4    The Court cannot agree with Berkley's argument that, because his relevant acts were

5    performed on behalf of Base4, there is no personal jurisdiction.  Courts cannot exercise personal

6    jurisdiction over a corporation's non-resident officers or personnel simply because those non-

7    residents are employed by the corporation.  See Davis v. Metro Productions, Inc., 885 F.2d 515,

8    520 (9th Cir. 1989).  However, it does not follow that a corporation's non-resident officers can

9    show an absence of personal jurisdiction because they have performed relevant acts on behalf of

10   the corporation or in their capacity as corporate employees.  See Calder v. Jones, 465 U.S. 783,

11   790 (1984); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984); Davis, 885 F.2d at

12   521-22; Epic Commc'ns, Inc. v. Richwave Technology, Inc., 179 Cal.App.4th 314, 330 (2009);

13   Goehring v. Superior Ct., 62 Cal.App.4th 894, 905-06 (1996); Taylor-Rush v. Multitech Corp.,

14   217 Cal.App.3d 103, 117-18 (1990).  Instead of focusing on titles or in what capacity an act was

15   performed, courts determine personal jurisdiction by analyzing the non-resident officer's actual

16   contacts with the forum relative to the dispute.  See Calder, 465 U.S. at 790; Keeton, 465 U.S. at

17   781 n.13; Davis, 885 F.2d at 521-22; Epic, 179 Cal.App.4th at 330; Taylor-Rush, 217 Cal.App.3d

18   at 117-18.  That is, courts analyze whether each non-resident officer has sufficient minimum

19   contacts with the forum, not whether the acts were undertaken on behalf of the corporation.  See

20   Davis, 885 F.2d at 522; Taylor-Rush, 217 Cal.App.3d at 117-18.  Therefore, Berkley's reliance on

21   his corporate position, or in the capacity in which he performed various acts, is unavailing.  See

22   Calder, 465 U.S. at 790; Keeton, 465 U.S. at 781 n.13; Davis, 885 F.2d at 521-22; Epic, 179

23   Cal.App.4th at 330; Goehring, 62 Cal.App.4th at 905-06; Taylor-Rush, 217 Cal.App.3d at 117-18.

24   2.    Minimum Contacts

25   a.    Purposeful Direction

26   i.    Intentional Act

27   Plaintiffs' opposition identifies the following "intentional acts" by Berkley:  (1) siphoning

28   funds from Wink; (2) misappropriating and selling artwork and labels of Wink; (3) falsely

10

1    representing to retailers that BB17 products were harmful and unfit for human use; and (4) falsely

2    reporting to the FBI that Abrahamson was a Base4 employee, Abrahamson and BB17 used his

3    employment relationship to defraud Berkley/Base4 by using artwork that Berkley/Base4 owned,

4    and BB17's products were unfit for human use.  Siphoning, misappropriating, and falsely

5    reporting or misrepresenting are "external manifestation[s] of the actor's intent to perform an

6    actual, physical act in the real world . . . ."  In re W. States, 715 F.3d at 743 n.25.  Berkley makes

7    no contrary argument.  Therefore, Berkley engaged in "intentional acts."  Id.

8                          ii.    Express Aiming

9                          (1)    Siphoning/Misappropriating Wink's Assets

10            It appears that the first two intentional acts, siphoning Wink's funds and misappropriating

11   Wink's assets (artwork and labels), relate to the first cause of action for breach of fiduciary duty.

12   See FAC ¶ 35; Doc. No. 14 at 6:19-7:2.  The fiduciary duty is allegedly owed by Parker to

13   Abrahamson based on their mutual membership in Wink.  See FAC ¶ 34.  Through a conspiracy,

14   Berkley is liable to Abrahamson for Parker's breach of fiduciary duty.[4]  See id. at ¶¶ 14, 36, 53.

15   The Court understands Plaintiffs to argue that because Berkley knew that Abrahamson is a

16   California citizen, and because he intentionally conspired to harm Abrahamson through breaches

17   of fiduciary duties, Berkley's acts of siphoning and misappropriating Wink's assets were expressly

18   aimed at California.  So viewing Plaintiffs' argument, it appears inconsistent with recent authority.

19            The Supreme Court in Walden and the Ninth Circuit in Picot (which followed Walden)

20   emphasized that a plaintiff cannot be the only connection with a forum, and that a mere injury to a

21   plaintiff who is known to reside in the forum will not create specific personal jurisdiction.  See

22   Walden, 134 S.Ct. at 1122, 1125; Picot, 780 F.3d at 1214.  There must be contacts with the forum,

23   not merely contacts with the plaintiff.  See id.  Here, Plaintiffs have not shown that siphoning and

24   misappropriating Wink's funds and assets were contacts with California, or that California was

25
_____
26   [4] "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually
     committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration."
27   Applied Equip. Corp. v. Litton Saudi Arabia, Ltd., 7 Cal.4th 503, 510-11 (1994); Kenne v. Stennis, 230 Cal.App.4th
     953, 968 (2014).  A party who participates in a civil conspiracy becomes liable for the torts of coconspirators, but
28   there is no liability unless an actual tort is committed pursuant to the conspiracy.  See Applied Equip., 7 Cal.4th at
     511; Kenne, 230 Cal.App.4th at 968-69.

somehow involved in the siphoning or misappropriating.  For example, there are no allegations that the assets were in California, or that Berkley somehow performed these acts while in California.  The assets in question belong to Wink (a Nevada entity), and it is unknown where these assets were actually located.  Further, since Parker, Base4 and Berkley are in Texas, it is reasonable to assume that Berkley performed the acts of siphoning and misappropriating in Texas, not in California.  The only thing that appears to link Berkley's alleged misappropriation and siphoning to California is Abrahamson himself, otherwise, these acts appear to have nothing to do with California.  See Walden, 134 S.Ct. at 1125; Picot, 780 F.3d at 1215.

Therefore, per *Walden* and *Picot*, although Abrahamson may be affected in California, Berkley's siphoning and misappropriating funds and assets from Wink, likely in either Texas or Nevada, do not show express aiming at California.  See Walden, 124 S.Ct. at 1122, 1125; Picot, 780 F.3d at 1214-15.  Without express aiming, there is no purposeful direction.  See Schwarzenegger, 374 F.3d at 803.  Because the misappropriating and siphoning were not purposefully directed at California, the Court lacks personal jurisdiction over the first cause of action.  See In re W. States, 715 F.3d at 742.

(2)      False Representations To Retailers

Plaintiffs contend that Berkley made false statements about BB17's products to retailers, specifically that BB17's products were harmful and unfit for human use.  The FAC also alleges that Berkley falsely reported to retailers that "the Plaintiffs, in the creation, distribution, and sale of BB17 products, had illegally circumvented approval by the Food and Drug Administration."  FAC ¶ 24.  This allegation appears to support the second and third causes of action, tortious interference with prospective business relations and unfair competition.

The identified misrepresentations suffer from the same deficiency as the alleged siphoning and misappropriating.  Plaintiffs have not shown that the misrepresentations are actual contacts with California.  It is true that the FAC alleges that Berkley intended to disrupt BB17's business in California.  However, there are no allegations or evidence that the misrepresentations specifically targeted California.  The FAC alleges that Berkley made the misrepresentation to national retailers Walgreens, Target, and Big Lots.  The opposition also indicates that BB17 operated nationwide.

The nature of the misrepresentations is such that the effects would not be limited to California, rather the misrepresentations are general and would apply nationwide.  A BB17 product that is harmful and unfit for human consumption would be unfit in every state in which it is sold, not just California.  As nationwide retailers, if Walgreens, Target, and Big Lots were influenced by or believed the misrepresentations, BB17 would experience harm in every market where Walgreens, Target, and Big Lots sold BB17 products.  There is nothing that would specifically link the misrepresentations to California in a meaningful way.  See Picot, 780 F.3d at 1215.

Further, the misrepresentations are akin to defamation.  *Calder v. Jones*, 465 U.S. 783 (1984) involved a libel claim that was brought in California against Florida citizens, and personal jurisdiction was found to be proper.  In *Walden*, the Supreme Court discussed and explained *Calder* as follows:

> The crux of *Calder* was that the reputation-based "effects" of the alleged libel connected the defendants to California, not just to the plaintiff.  The strength of that connection was largely a function of the nature of the libel tort.  However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons.  Accordingly, the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens.  Indeed, because publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred in California.  In this way, the "effects" caused by the defendants' article—i.e., the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to California, not just to a plaintiff who lived there.

Walden, 134 S.Ct. at 1123-24 (citations omitted).  In other words, the publication and circulation of a libelous newspaper article in California was a meaningful contact with California itself.

Here, that kind of connection to California is missing.  For example, there is no evidence or allegations about where the misrepresentations were actually made, or that the misrepresentations were somehow received by Walgreens, Target, and Big Lots in California.  It is entirely unknown where the misrepresentation were published, received, or made.  As nationwide retailers, the misrepresentations could have been received in any state, sent to any state, or made in any state.[5]  Nothing tethers the misrepresentations to California in a meaningful way.  Cf. Walden,

---

[5] Walgreens's corporate headquarters are in Illinois, see http://corporateofficehq.com/walgreens-corporate-office, Target's corporate headquarters are in Minnesota, see http://corporateofficehq.com/target-corporate-office, and Big

1    134 U.S. at 1122-25; <u>Calder</u>, 465 U.S. at 788-89; <u>Picot</u>, 780 F.3d at 1215.  The only connection

2    that Berkley's misrepresentations have to California is the knowledge that Abrahamson worked

3    and lived there, and that Abrahamson and BB17 would feel some economic harm in California, as

4    well as in any other state in which Walgreens, Target, or Big Lots received Berkley's

5    misrepresentations or intended to sell BB17 products.  That is insufficient for purposes of personal

6    jurisdiction.  <u>See Walden</u>, 134 S.Ct. at 1122-25; <u>Picot</u>, 780 F.3d at 1214-15 ("[The] tortious

7    conduct consists of making statements to Coats (an Ohio resident) that caused HMR (a Delaware

8    corporation with offices in Ohio) to cease making payments into two trusts (in Wyoming and

9    Australia).  Weston did all this from his residence in Michigan, without entering California,

10   contacting any person in California, or otherwise reaching out to California.").

11          Because the misrepresentations were not expressly aimed at California, there is no

12   purposeful direction, and thus, no personal jurisdiction over the second and third causes of action.

13   <u>See In re W. States</u>, 715 F.3d at 742; <u>Schwarzenegger</u>, 374 F.3d at 803.

14                          <u>(3)      False Representations To The FBI</u>

15          Plaintiffs contend that Berkley made knowingly false and malicious statements to the FBI

16   in Texas.  Specifically, Berkley told the FBI that Abrahamson was a Base4 employee, that

17   Abrahamson was engaged in fraudulent and illegal conduct towards Base4, and that the products

18   distributed by BB17 were dangerous and unfit for human use.  <u>See</u> FAC ¶ 22; Doc. No . 14 at 6:8-

19   12.  These statements were made in furtherance of a conspiracy to create a threat of criminal

20   liability against Plaintiffs, and for the purposes of intimidating Plaintiffs and effecting the

21   institution of criminal proceedings against Abrahamson.  <u>See</u> FAC ¶ 14, 22; Doc. No. 14 at 7:16-

22   18.  The false statements resulted in a raid and search of Abrahamson's home in California by the

23   FBI and local law enforcement.  <u>See</u> FAC ¶ 25.  Abrahamson's personal property as well as

24   samples and business documents of BB17 were seized during the search.  <u>See id.</u>  These

25   allegations support the fourth causes of action, malicious prosecution of Abrahamson.

26          The Court finds that Berkley's false representations were expressly aimed at California.  A

27

28   _____

Lots's corporate headquarters are in Ohio, <u>see</u> http://corporateofficehq.com/big-lots-corporate-office.   Given the
nature of the misrepresentations, they may well have been received in the retailers' respective headquarters.

federal criminal action against Abrahamson would necessitate the investigation of Abrahamson in California, the possible extradition of Abrahamson from California to Texas, and a search of Abrahamson's property in California.  Although Abrahamson was not extradited to Texas to face criminal charges, he was investigated and his property was searched and seized in California. Even though Berkley's representations were in Texas, they had the effect of reaching into California and causing intrusive investigative actions to take place in California against Abrahamson.  The FAC's allegations indicate that this was at least part of Berkley's intended result.  See FAC ¶¶ 14, 22, 23, 25.  Because the false statements led to an intended investigation and search of Abrahamson's home in California, the statements are a sufficient and meaningful contact with California.[6]  Cf. Walden, 134 S.Ct. at 1123-24 (explaining that there was meaningful contact with California in the *Calder* case because a libelous newspaper article was distributed in California); Lake v. Lake, 817 F.2d 1416, 1423 (9th Cir. 1987) (upholding personal jurisdiction in Idaho when a California attorney obtained a California custody order for a California mother, knowing that the order would be used in Idaho courts to obtain custody from an Idaho father).

(iii)   Foreseeable Harm In California

At all relevant times, from at least 2005 to the present, Abrahamson has resided in Kings County, California.  See FAC ¶¶ 1, 13, 25.  Given the misrepresentations made by Berkley, the alleged intent behind the misrepresentations, and Berkley's knowledge of Abrahamson's California residence, it was reasonably foreseeable that Abrahamson would suffer constitutionally sufficient harm in California.  See Brayton Purcell, 606 F.3d at 1131.

b.   Claims Arising Out of Forum Related Conduct

As discussed above, the only acts by Berkley that were "expressly aimed" at California were the false representations to law enforcement.[7]  Those acts form the basis of Abrahamson's malicious prosecution claim.  But for Berkley's alleged misrepresentations, there would be no

---

[6] Berkley did not address the false statements to the FBI in either his Rule 12(b)(2) motion or Rule 12(b)(2) reply.

[7] Because the other acts by Berkley that Plaintiffs identify were not expressly aimed at California, the Court lacks personal jurisdiction over claims based on Berkley siphoning Wink funds, misappropriating Wink assets, and making false statements to retailers.  See Picot, 780 F.3d at 1211; In re W. States, 715 F.3d at 742.

1   investigation, no search, and no cause of action for malicious prosecution. Myers, 238 F.3d at

2   1075. Therefore, Abrahamson's claim arises out of his California related conduct. See id.

3          c.    Reasonableness

4          Because Abrahamson has met the first two prongs of specific jurisdiction with respect to

5   his fourth cause of action, the burden shifts to Berkley to make a "compelling case" that exercising

6   personal jurisdiction would be unreasonable. See Picot, 780 F.3d at 1211-12; Mavrix Photo, 647

7   F.3d at 1228. Berkley contends that he met this burden because each of his actions that are

8   identified in the FAC were done in a corporate capacity on behalf of Base 4, and because he is the

9   only person being hailed to California even though Abrahamson, BB17, Base4, Parker, and Wink

10  are all involved in litigation together in Texas.

11         Berkley has not met his burden. First, as discussed above, Berkley's title and position as a

12  corporate officer of Base4 do not defeat personal jurisdiction. See Calder, 465 U.S. at 790;

13  Keeton, 465 U.S. at 781 n.13; Davis, 885 F.2d at 521-22; Epic, 179 Cal.App.4th at 330; Taylor-

14  Rush, 217 Cal.App.3d at 117-18. It is Berkley's conduct, not his title, that is determinative. See

15  id. Second, it is true that there is active litigation occurring in Texas between Abrahamson, BB17,

16  Parker, Wink, and Base4. It appears that many of the issues and theories raised in the FAC are

17  related to the Texas litigation. Nevertheless, the malicious prosecution cause of action is different.

18  The malicious prosecution claim is only brought by Abrahamson, and it involves a unique injury

19  to Abrahamson that was caused by Berkley alone. Wink, BB17, and Parker have a slight

20  relationship to the malicious prosecution claim. Given the unique nature of Abrahamson's

21  malicious prosecution claim, Berkley has not adequately explained how the pendency of the Texas

22  litigation makes exercising personal jurisdiction over him unreasonable in this case.

23         In his reply, Berkley for the first time addresses the seven factors used by the Ninth Circuit

24  to evaluate reasonableness. However, there are several problems with Berkley's discussion. First,

25  Berkley incorrectly places the burden of showing reasonableness on Abrahamson. See Doc. No.

26  23 at 5:5-6. In fact, it is Berkley's burden to show that exercising personal jurisdiction would be

27  unreasonable. Picot, 780 F.3d at 1211-12. Second, because showing "unreasonableness" is

28  Berkley's burden, he should have addressed the seven factors in his moving memorandum, not as

part of a reply.  Although Abrahamson addressed the factors in his opposition, Berkley's complete

analysis of the seven factors is part of a reply and Abrahamson has not had a fair opportunity to

respond to Berkley's arguments.  See Zamani, 491 F.3d at 997; Eberle, 901 F.2d at 818.  Finally,

Berkley's analysis of the seven factors focuses on the FAC's first three causes of action, it does

not address the factors in relation to the malicious prosecution claim.

     In sum, Berkley has failed to make a compelling case that exercising personal jurisdiction

over him would be unreasonable.  Picot, 780 F.3d at 1211-12; In re W. States, 715 F.3d at 745;

Mavrix Photo, 647 F.3d at 1228.  Therefore, there is personal jurisdiction over the fourth cause of

action.  See In re W. States, 715 F.3d at 745.

     3.    Pendent Personal Jurisdiction

     "If personal jurisdiction exists over one claim, but not others, the district court may

exercise pendent personal jurisdiction over any remaining claims that arise out of the same

'common nucleus of operative facts' as the claim for which jurisdiction exists."  Picot, 780 F.3d at

1211 (quoting Action Embroidery Corp. v. Atlantic Embroidery, Inc., 368 F.3d 1174, 1180 (9th

Cir. 2004)).  The decision to exercise pendent personal jurisdiction is within the discretion of the

district court and depends on "considerations of judicial economy, convenience and fairness to

litigants."  Action Embroidery, 368 F.3d at 1181.

     Here, specific personal jurisdiction exists over Berkley only with respect to the fourth

cause of action.[8]  The fourth cause of action is based on a Berkley improperly procuring a search

warrant through misrepresentations to the FBI, and the resulting search of Abrahamson's

residence.  The misrepresentations were that Abrahamson was an employee of Base4, that

Abrahamson used that employment relationship to defraud Berkley or Base4, and that BB17's

products were dangerous and unfit for human consumption.

     The first cause of action (breach of fiduciary duty) is based on Berkley siphoning and

misappropriating Wink's assets.  These actions are different from Berkley's misrepresentations to

the FBI and the resulting search of Abrahamson's home.  Also, similar claims appear to be at issue

---

[8] As noted above, the fifth cause of action for conspiracy is not really a cause of action, rather it is a theory to make
co-conspirators liable for each other's torts.  See Applied Equip., 7 Cal.4th 503, 510-11; Footnote 4, *supra*.

1  in the Texas litigation.  For these reasons, the Court will decline to exercise supplemental pendent

2  jurisdiction over the first cause of action.  See Action Embroidery, 368 F.3d at 1180-81.

3      The second cause of action (tortious interference with prospective business relationship) is

4  based on misrepresentations that Berkley made to Walgreens, Target, and Big Lots.  The

5  misrepresentations were that Abrahamson and BB17 skirted FDA regulations and that BB17's

6  products were unfit for human consumption.  This is similar to one of the misrepresentations in the

7  fourth cause of action, that Berkley told the FBI that BB17 products were unfit for human

8  consumption.  Although this misrepresentation is shared between the third and fourth causes of

9  action, there are significant differences.  First, additional and different misrepresentations were

10  made to both the FBI and the retailers.  Berkley told the retailers, but not the FBI, that

11  Abrahamson and BB17 skirted FDA regulations.  Berkley told the FBI, but not the retailers, that

12  Abrahamson was an employee of Base4 and that Abrahamson had defrauded Berkley and/or

13  Base4.  Second, the misrepresentations were made to two distinct groups at separate times.

14  Berkley made the misrepresentations to the retailers in July 2013, but made the misrepresentations

15  to the FBI one month later in August 2013.  See id. at ¶¶ 21, 22.  Third the misrepresentations

16  were made for different purposes.  Berkley made the misrepresentations to the FBI in order to

17  intimidate Abrahamson and instigate a criminal investigation and prosecution of Abrahamson, but

18  made the misrepresentations to the retailers in order to interfere with BB17's sales.[9]  Given these

19  differences, it does not appear that the second and fourth causes of action sufficiently arise form a

20  common nucleus of operative facts.  Therefore, the Court will decline to exercise pendent personal

21  jurisdiction over the second cause of action.  See Action Embroidery, 368 F.3d at 1180-81.

22      The third cause of action is for unfair competition.  California Business & Professions

23  Code § 17200 prohibits "unfair competition," which is defined to mean any "unlawful, unfair, or

24  fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200; In re Tobacco II Cases, 46

25  Cal.4th 298, 311 (2009).  For claims based on "unlawful" conduct, § 17200 "borrows violations of

26  other laws and treats these violations, when committed pursuant to business activity, as unlawful

27

28  [9] The Court notes that BB17 was a Nevada limited liability company, and is currently a Wyoming limited liability
   company.  Under the laws of Nevada and Wyoming, BB17 is a separate and distinct legal entity from its members.
   Nev. Rev. Stat. § 86.201(3); Wyo. Stat. § 17-29-104(a).

1  practices independently actionable . . . and subject to the distinct remedies provided thereunder."

2  Farmers Ins. Exch. v. Superior Ct., 2 Cal.4th 377, 383 (1992).  The allegations under the third

3  cause of action consist of two sentences, one that incorporates all prior allegations by reference

4  and one that says Berkley's acts constitute "unfair competition."  See FAC at ¶¶ 47, 48; see also

5  Doc. No. 14 at 6:28-7:3.  Given these allegations, the Court reads the third cause of action as

6  being based on the first two causes of action.  So reading the FAC, for the same reasons that the

7  Court declines to exercise pendent personal jurisdiction over the first two causes of action, the

8  Court also declines to exercise pendent personal jurisdiction over the third cause of action.  See

9  Action Embroidery, 368 F.3d at 1080-81.

10      4.      BB17 and Wong

11      BB17 and Wong seek a recovery against Berkley under the second and third causes of

12  action only.  As discussed above, the Court does not have personal jurisdiction over the second

13  and third causes of action, and the Court has declined to exercise pendent supplemental

14  jurisdiction over them.  Because the only claims brought by BB17 and Wong are no longer a part

15  of this case, it is appropriate to dismiss BB17 and Wong from this case.

16

17  **II.     SLAPP Motion – California Code of Civil Procedure 425.16**[10]

18      *Legal Framework*

19      California law provides for pre-trial dismissals of certain actions that "masquerade as

20  ordinary lawsuits but are intended to deter ordinary people from exercising their political or legal

21  rights or to punish them for so doing."  Makaeff v. Trump Univ., LLC, 715 F.3d 254, 261 (9th Cir.

22  2013) (citation and quotation omitted); Cal. Code Civ. P. § 425.16.  There is a two-step process

23  that courts follow in evaluating SLAPP motions.  Roberts v. McAfee, Inc., 660 F.3d 1156, 1163

24  (9th Cir. 2011); Mindys Cosmetics, Inc. v. Dakar, 611 F.3d 590, 595 (9th Cir. 2010); Oasis West

25  Realty, LLC v. Goldman, 51 Cal.4th 811, 819 (2011).  First, the defendant must make a prima

26

27  _____

[10] Because the only claim over which this Court has personal jurisdiction is Abrahamson's malicious prosecution
claim, the Court will not address arguments or issues that relate to Abrahamson's other causes of action.  Also,
28  Berkley has made numerous objections to the various declarations submitted by Abrahamson.  See Doc. No. 25.  To
the extent that the Court utilizes a declaration or part of a declaration, any objection by Berkley thereto is overruled.

1  facie showing that the suit arises from an act in furtherance of the defendant's rights of petition or

2  free speech.  Roberts, 660 F.3d at 1163; Mindys Cosmetics, 611 F.3d at 595; see Oasis West, 51

3  Cal.4th at 819.  Second, once the defendant makes this showing, the burden shifts to the plaintiff

4  to demonstrate a probability of prevailing on the challenged claims.  Roberts, 660 F.3d at 1163;

5  Mindys Cosmetics, 611 F.3d at 595; see Oasis West, 51 Cal.4th at 819-20.

6         Under the second step, "reasonable probability" in the SLAPP context means "only a

7  minimum level of legal sufficiency and triability."  Graham-Sult v. Clainos, 756 F.3d 724, 740

8  (9th Cir. 2014).  "[A] plaintiff must demonstrate that the complaint is both legally sufficient and

9  supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the

10  evidence submitted by the plaintiff is credited."  Doe v. Gangland Prods., 730 F.3d 946, 957 (9th

11  Cir. 2013); Wilson v. Parker, Covert & Chidester, 28 Cal.4th 811, 821 (2002). "The applicable

12  burden is much like that used in determining a motion for nonsuit or directed verdict, which

13  mandates dismissal when no reasonable jury could find for the plaintiff."  Gangland Prods, 730

14  F.3dat 957.  In ruling on a SLAPP motion, courts are to consider "the pleadings, and supporting

15  and opposing affidavits stating the facts upon which the liability or defense is based."  Graham-

16  Sult, 756 F.3d at 740-41 (quoting Cal. Code Civ. P. § 425.16(b)(2)).  However, courts cannot

17  "weigh the credibility or comparative probative strength of competing evidence."  Gangland

18  Prods., 730 F.3d at 957; Wilson, 28 Cal.4th at 821.  A claim will be dismissed if:  (1) the

19  defendant's evidence establishes as a matter of law that plaintiff cannot show a probability of

20  prevailing; (2) there is an insufficient legal basis for plaintiff's claim; or (3) if, on the basis of the

21  facts presented by the plaintiff, no reasonable jury could find in favor of the plaintiff.  See

22  Gangland Prods., 730 F.3d at 957; Makaeff, 715 F.3d at 261.

23         *Defendant's Argument*

24         Berkley argues that his statements to the FBI were to inform the FBI of Abrahamson's

25  wrongful conduct.  These statements are privileged under California Civil Code § 47(b) because

26  they are statements that are made to law enforcement in furtherance of an investigation.  Berkley

27  also argues that Abrahamson does not have a sufficient probability of prevailing.  Berkley argues

28  that he gave true statements to the FBI, and that the statements are a reasonable interpretation of

1    the facts.  Tax forms, as well as statements from Abrahamson, show that Abrahamson was a Base4

2    employee and Base4 paid for the designs created by Suzanne Abrahamson and Gail Onstad.

3    Further, the FBI itself concluded that there was sufficient information that Abrahamson stole

4    package labels/artwork form Base4 and that Abrahamson falsely represented to the public that

5    BB17 products were FDA approved.

6         In reply, Berkley argues that the commercial speech exception to SLAPP motions does not

7    apply because, pursuant to the FAC's allegations, Berkley's statements were made for the

8    purposes of injuring Abrahamson, not for the purposes of obtaining a commercial transaction for

9    goods.  Further, Berkley contends that Abrahamson did not show a probability of success.  First,

10   there was probable cause for each of the statements that Berkley made to the FBI.  Second, there

11   are no California cases that address whether obtaining a search warrant can constitute malicious

12   prosecution.  Third, reports to law enforcement are absolutely privileged under Civil Code § 47(b).

13   Finally, the decision not to bring charges does not constitute a favorable termination.

14        *Plaintiffs' Opposition*

15        Abrahamson argues that Berkley's statements fit the "commercial speech" exception to

16   SLAPP motions under Code of Civil Procedure § 425.17(c).  All of Berkley's conduct and

17   statements to the FBI were done as an effort to promote and sell Base4 products and destroy

18   Abrahamson and BB17.  Further, the statements Berkley made to the FBI were statements that

19   were likely to be repeated by the FBI to retailers, i.e. buyers/customers, during the course of the

20   investigation.

21        Abrahamson also argues that he has made a sufficient showing of a probability of success.

22   First, malicious prosecution claims are excepted from the Civil Code § 47(b) privilege.  Second,

23   Comment C to § 654 of the Restatement (Second) of Torts recognizes that a cause of action for

24   malicious prosecution may be based on the malicious procurement of a search warrant without

25   probable cause.  The evidence suggests that Berkley withheld the existence of Wink from the FBI

26   because the affidavit in support of the search warrant did not mention Wink.  In October 2012, just

27   before Berkley took his case to the FBI, he had attempted to get Abrahamson to sign away his

28   interest in Wink and agree to be a Base4 employee.  Moreover, Suzanne Abrahamson and Gail

Onstad were independent contractors and their work did not qualify as works made for hire.  They

retained the rights to their artwork, and so informed the FBI.  There is no document evidencing a

transfer of ownership rights in the artwork to Base4.  Thus, there was no legitimate basis for

representations that Abrahamson was a Base4 employee or that he stole artwork.  Finally, there

was a favorable termination because no incriminating evidence was found during the search, and

two United States Attorney's Offices abandoned the case.

### *Discussion*

1.  Civil Code § 47(b) Privilege

California Civil Code § 47 "establishes a privilege that bars liability in tort for the making

of certain statements."  Hagberg v. California Fed. Bank, 32 Cal.4th 350, 360 (2004).  Section

47(b) in part provides an absolute privilege for statements "intended to instigate official

governmental investigation into wrongdoing, including police investigation . . . ."  Id. at 370; see

Kemps v. Beshwate, 180 Cal.App.4th 1012, 1019 (2009).  However, § 47(b)'s privilege does not

apply to claims of malicious prosecution.  Graham-Sult, 756 F.3d at 741; Hagberg, 32 Cal.4th at

361; Kemps¸ 180 Cal.App.4th at 1019.  Here, because the only claim left against Berkley is a

malicious prosecution claim, § 47(b) does not apply. See Hagberg, 32 Cal.4th at 361, 370;

Kemps¸ 180 Cal.App.4th at 1019.

2.  Commercial Speech Exception

California Code of Civil Procedure § 425.17 provides several exceptions to SLAPP

motions, including a "narrow" exception for "commercial speech."  See Cal. Code Civil P. §

425.17(c); Simpson Strong-Tie Co., Inc. v. Gore, 49 Cal.4th 12, 21-22 (2010); Hawran v. Hixson,

209 Cal.App.4th 256, 270-71 (2014).  It is the plaintiff's burden to establish that § 425.17(c)

applies. Simpson Strong-Tie, 49 Cal.4th at 24; Hawran, 209 Cal.App.4th at 271. Section 425.17(c)

will apply if four elements are met:  (1) the cause of action is against a person primarily engaged

in the business of selling or leasing goods or services; (2) the cause of action arises from a

statement or conduct by that person consisting of representations of fact about that person's or a

business competitor's business operations, goods, or services; (3) the statement or conduct was

made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or

1  commercial transactions in, the person's goods or services or in the course of delivering the

2  person's goods or services; and (4) the intended audience is an actual or potential buyer or

3  customer, or a person likely to repeat the statement to, or otherwise influence, an actual or

4  potential buyer or customer.  Simpson Strong-Tie, 49 Cal.4th at 30; Hawran, 209 Cal.App.4th at

5  271.

6       Here, the Court will accept that the first element of § 425.17(c) has been met based on

7  Berkley's connection to Base4 and the nature of Base4's business.  The Court also accepts that the

8  second element has been met in that Berkley's comments indicate that Abrahamson was engaged

9  in theft and fraud during the course of selling BB17 goods, and that BB17's/Abrahamson's goods

10  were dangerous.  However, the crux of the matter is that Berkley's misrepresentations to the FBI

11  were made in the context of making a criminal complaint against, or instigating a criminal

12  investigation into, Abrahamson.  The misrepresentations were not made in any kind of commercial

13  context whatsoever.  Berkley did not make statements to the FBI in the course of delivering his

14  products, nor did he make any statements to the FBI for the purpose of promoting or securing the

15  sales of his products.  The statements were made for the purposes of harming and intimidating

16  Abrahamson and creating a threat of criminal liability.  See FAC ¶¶ 14, 22.  Therefore, the third

17  element is not met, and the commercial speech exception does not apply.  See Simpson Strong-

18  Tie, 49 Cal.4th at 21-22, 30; Hawran, 209 Cal.App.4th at 270-71.

19           3.      SLAPP Motion

20                  a.      Defendant's Prima Facie Showing

21       Communications to law enforcement are covered by the SLAPP.  Comstock v. Aber, 212

22  Cal.App.4th 931, 941-42 (2012).  Abrahamson agrees that Berkley's statements to the FBI are

23  covered.  See Doc. No. 16 at 9:11-12.  Therefore, Berkley's communications to the FBI are

24  protected under SLAPP, and Berkley has made the requisite prima facie showing.  See Roberts,

25  660 F.3d at 1163; Comstock, 212 Ca.App.4th at 941-42.  The burden now shifts to Abrahamson to

26  show a probability of success.  See Roberts, 660 F.3d at 1163; Oasis West, 51 Cal.4th at 819-20.

27                  b.      Plaintiff's Probability of Success

28       Abrahamson's malicious prosecution claim is not a garden variety claim because no

23

criminal charges were ever filed against him.  Instead, Abrahamson's claim is based on the

issuance and execution of a search warrant at his home.  The parties have not cited any California

cases that have recognized this form of malicious prosecution, and the Court is aware of none.

However, such a claim is recognized at common law.  E.g., Malley v. Briggs, 475 U.S. 335, 341

n.3 (1986); Martin v. Finley, 2016 U.S. Dist. LEXIS 93221, *12-*14 (M.D. Pa. July 15, 2016);

Quantlab Techs Ltd. (BGI) v. Godlevsky, 2012 U.S. Dist. LEXIS 92233, *7-*9 (S.D. Tex. July 3,

2012) (and cases cited therein); United States Fire Ins. Co. v. Tel. Elecs. Corp., 2003 U.S. Dist.

LEXIS 28225, *46 & n.13 (S.D. Miss. Mar. 28, 2003) (and cases cited therein); Restatement

(Second) of Torts § 654, Comment C (1977).[11]  At common law, a claim for malicious prosecution

will lie when a person with malice and without probable cause procures the issuance of a search

warrant.  E.g. United States Fire Ins., 2003 U.S. Dist. LEXIS 28225 at *46 n.13; Shaw v. Moon,

245 P. 318, 320 (Or. 1926); Hardin v. Hight, 153 S.W. 99, 101 (Ark. 1913); Olson v. Haggerty,

124 P. 145, 147-48 (Wash. 1912); Krehbiel v. Henkle, 121 N.W. 378, 379-880 (Iowa 1909); Olson

v. Tvete, 48 N.W. 914 (Minn. 1891); Carey v. Sheets, 67 Ind. 375, 378 (1879).  "The essence of

the injury resulting from a wrongful search is the unwarranted invasion of one's premises and

property and the notoriety, suspicion, and disgrace incident to the imputation of crime thereby

implied."  Haggerty, 124 P. at 148; see Krehbiel, 121 N.W. at 380.  In the absence of a contrary

argument, the Court will assume for purpose of this motion that California courts would recognize

this species of malicious prosecution.[12]

Here, Abrahamson has submitted declarations that indicate:  (1) Wink is a separate entity

from Base4, see Abrahamson Dec. ¶¶ 5, 6, 7, 8, 10, 11, 14, 18; (2) Base4 acted as the distributor of

Wink products and also provided administrative support for Wink, see id. at ¶¶ 6, 11, 12, 13, 25;

(3) Abrahamson was a managing partner of Wink and not an employee of Base4, see id. at ¶¶ 7,

---

[11] California courts generally look to the Restatement (Second) of Torts "for guidance as to the type of conduct that
will give rise to a malicious prosecution claim in the context of a criminal prosecution."  Zucchet v. Galardi, 229
Cal.App.4th 1466, 1483 (2014) (citing Zamos v. Stroud, 32 Cal.4th 958 (2004)).

[12] Berkley cites Begier v. Strom, 46 Cal.App.4th 877 (1996) as an analogous California case because it involved a
"false police report."  Begier involved allegations of child molestation that were made in connection with
divorce/child custody proceedings.  See Begier, 46 Cal.App.4th at 885.  The Court of Appeal concluded that there was
no actionable malicious prosecution because that tort does not extend to claims arising out of family law proceedings.
Id. at 886-88.  Because Begier's analysis focused on family law proceedings, it is not instructive in this case.

12, 13, 14, 18, 20, 21; (4) despite Berkley's accusation of Abrahamson stealing his (Berkley's) artwork, Base4/Berkley never owned the artwork/labels in question, rather Wink obtained permission from the artists/designers to use the artwork/labels, see id. at ¶¶ 24, 25; Suzanne Abrahamson Dec. ¶¶ 2, 3, 5; Onstad Dec. ¶ 2-5; (5) Abrahamson did not admit that he was an employee of Base4, see Abrahamson Dec. ¶ 28; (6) the items identified in the search warrant application as "Base4 products" are actually Wink products that were distributed by Base4, see id. at ¶ 29; (7) the search warrant does not mention Wink Bath & Body, LLC, see id. at ¶ 27; Chang Dec. Ex. C; (8) two United States Attorneys' Offices in Texas have declined to bring charges following the issuance of the search warrant and the conclusion of the investigation, see Abrahamson Dec. ¶ 33; Conway Dec. ¶¶ 4, 5, 6 & Ex. A; (9) Berkley was personal friends with the investigating FBI Agent (Klimek) and the agent would visit Berkley's home, see Thornton Dec. ¶ 3; and (10) Parker and Berkley began duplicating Wink's "spa perfect" line and art with Base4's own "groovi" product line in 2013.  See Abrahamson Dec. ¶ 30; Suzanne Abrahamson Dec. ¶ 4, 5 & Exs. A, B.  For purposes of deciding this motion, the Court must credit Abrahamson's evidence, and the Court cannot weigh the credibility or probative strength of competing evidence.  Gangland Prods., 730 F.3d at 957; Wilson, 28 Cal.4th at 821.

So viewing this evidence, Abrahamson has met his burden.  First, with respect to the element of probable cause, as discussed above, the search warrant was issued in order to obtain evidence related to mail fraud, wire fraud, and conspiracy to commit mail or wire fraud.  These claims involve as a necessary element a "scheme or artifice to defraud."  See United States v. French, 748 F.3d 922, 935 (9th Cir. 2014) (discussing mail and wire fraud); United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009) (discussing all three crimes).  Probable cause for the warrant was based on the premises that Abrahamson was a Base4 employee, Base4 owned the artwork in question, and Base4 owned the products (or the products' composition) that were similar to BB17's products.  Abrahamson's evidence is contrary to each of these premises. Abrahamson's evidence, if credited, shows that he was not a Base4 employee, Base4 did not own the artwork in question, Wink owned the products that were similar to BB17's products, and Base4 was the distributor of the Wink products.  If Base4 did not own the artwork and had no

ownership interest in the Wink products, then it is unclear how there could be a scheme or artifice to defraud Base4 as described in the warrant. Without a scheme or artifice to defraud, there can be no liability or probable cause for mail fraud, wire fraud, or conspiracy to commit mail or wire fraud. See French, 748 F.3d at 935; Maxwell, 579 F.3d at 1299.

Berkley argues that the evidence establishes probable cause. Berkley has cited in part to the declarations and exhibits provided by Base4 employee Byron Nowell. Nowell declares that Abrahamson was a Base4 employee from 2008 to 2013, Base4 paid Abrahamson a salary, Base4 provided health insurance to Abrahamson and his family, and Base4 reimbursed Abrahamson for business expenses. In a reply declaration, Nowell states that Base4 paid Gail Onstad and Suzanne Abrahamson for work done "on behalf of [Base4], including its Wink Bath & Body line of products." Doc. No. 24-1 ¶¶ 3, 4. Nowell's exhibits include W2 forms for Abrahamson that were issued by Base4 from 2010 to 2012, health insurance invoices from July 2012 to January 2013, and in the reply declaration, invoices from Gail Onstad and Suzanne Abrahamson.

There is a fundamental problem with Berkley's reliance on Nowell's evidence and declarations. There is nothing that links Nowell's information and evidence to Berkley himself. For example, there is no declaration by Berkley that describes his knowledge of or reliance on any of Nowell's information or documents. Without Berkley's knowledge of Nowell's information or documents, and more importantly without an explanation from Berkley himself that explains why he might believe that Abrahamson was a Base4 employee or that Base4 owned the artwork/labels in question, probable cause by Berkley cannot be established. Cf. Citi-Wide Couriers, Inc. v. Golden Eagle Ins. Co., 114 Cal.App.4th 906, 913 (2003) (noting that "probable cause" refers to whether "the defendant had an honest and reasonable belief in the truth of the allegations.") (citing inter alia Crowley v. Katleman, 8 Cal.4th 666, 686 (1994)).

Aside from the failure to link Nowell's evidence and knowledge to Berkley, the evidence does not sufficiently negate Abrahamson's submissions. The Court must credit Abrahamson's evidence. That credited evidence indicates that Berkley was aware of both Wink's separate existence and that Abrahamson was not a Base4 employee, because it was Berkley who had suggested that Abrahamson and Parker form the separate entity Wink and that Base4 act as the

1   distributor.  See Abrahamson Dec. ¶¶ 2, 3, 4, 5, 6, 13, 20, 21.  It does not appear that this

2   information or Wink's separate existence was revealed to the FBI.  See id. at ¶ 27; Chang Dec. Ex.

3   C.  Further, Abrahamson declares that he was told by Base4 personnel that the W2 forms were for

4   ease of Base4's accounting.  See id. at ¶ 12.  Thus, despite the W2's, the indication is that there

5   was no change in Abrahamson's relationship with Base4.  See id. & ¶¶ 13, 14, 20, 21.  Although

6   Abrahamson does not address the insurance premiums or the reimbursements for travel expenses,

7   it is possible that these were provided as advances or compensation for consulting work.

8   Abrahamson declared that he rejected a proposed employment contract and made significant

9   revisions to the proposed contract in order to reflect that he was not an employee, but was

10  independent contractor and consultant.  See id. at Dec. ¶ 20 & Ex. Q.  Lastly, the fact that Base4

11  may have paid fees to Gail Onstad and Suzanne Abrahamson does not per se establish Base4's

12  ownership of the artwork and labels.  It is possible that Base4 made the payments on behalf of

13  Wink or as a type of advancement or loan.  No document has been produced that establishes Base4

14  as the owner of the artwork, and the declarations of Abrahamson, Suzanne Abrahamson, and Gail

15  Onstad indicate that Base4 was not the owner.  See Abrahamson Dec. ¶¶ 24, 25; Suzanne

16  Abrahamson Dec. ¶¶ 2, 3, 5; Onstad Dec. ¶ 2-5

17       Berkley also cites excerpts from a transcript of a recorded call between himself and

18  Abrahamson, Pages 55, 67 to 68, 80, and 97.  Abrahamson's statements in the call were not made

19  under oath.  The Court finds that the excerpts are reasonably subject to more than one

20  interpretation.  When read in conjunction with Abrahamson's evidence, these excerpts, either

21  alone or together, do not establish probable cause as a matter of law.

22       The cited excerpt from Page 55 reads, "[Abrahamson:] But it's turned into this situation

23  now, You're nothing, you're just an employee.  And trust me, based - - if you look at the salary I

24  made - - . . . - - based on the dollars I brought in – and I've brought in over $20 million since I've

25  been in here if you look at all the Target, all the orders."  Chang Dec. Ex. F at 55:9-17.  In the

26  preceding lines of Page 55, Abrahamson talks about the initial goal of the venture with Berkley,

27  and then says "it's turned into this situation."  One reasonable interpretation is that Abrahamson is

28  repeating positions taken by Base4 personnel (and possibly Berkley) about his employment status,

but is not necessarily endorsing those positions.  Further, it is not clear what Abrahamson means

by salary and specifically whether it is meant as a recognition of employment.  Cf. Abrahamson

Dec. ¶ 20 & Ex. Q.  The structure of the transcription and sentence may also be indicative of

Abrahamson attempting to correct himself after he said "salary."  However, crediting

Abrahamson's declaration, in which he maintains that he was not an employee and expressly

states that he did not admit to being an employee during the recorded conversation, see id. at ¶¶

20, 21, 28, the Court cannot hold that Page 55 establishes probable cause.

The cited excerpts from Pages 67 and 68 of the transcript read:

Berkley:  I pay $33,000 for artwork, you're on my payroll, and you guys get the sales on Big Lots?

**Abrahamson**: Well - -

Berkley:  I mean, how did you justify that?

**Abrahamson**:  Well, first - -

Berkley:  You can say "I'm sorry" anywhere in here, too, if you want.

**Abrahamson**:  No.  I – okay.  I didn't mean "no" to - -

Berkley:  Right.  No, I - -

**Abrahamson**:  I'm trying to answer the questions.

Berkley:  Ok.

**Abrahamson**:  Okay.  I'm sorry how the whole thing transpired.  I didn't want it to transpire this way.  I've been wanting to get this - - work something out - -.

Chang Dec. Ex. F at 67:8-68:3.  As can be scene, this excerpt includes assertions regarding

ownership of the artwork and Abrahamson being "on the payroll."  However, the excerpt is

marked by Berkley interrupting Abrahamson.  By the time Abrahamson does respond, he is

mentioning how some situation "transpired."  Abrahamson does not contradict what Berkley said,

but Abrahamson does not expressly endorse it either.  The excerpt is consistent with Abrahamson

choosing not to respond to the two points.  Again, like the excerpts from Page 55, and crediting

Abrahamson's evidence, see Abrahamson Dec. ¶¶ 20, 24, 25, 28; Suzanne Abrahamson Dec. ¶¶ 2,

3, 5; Onstad Dec. ¶ 2-5, Pages 67 and 68 do not establish probable cause.

The relevant portion of Page 80 reads:

Berkley:  So did Joe think it's okay to take – skim artwork?  I don't - - I don't get -
- I'm trying to get this part.  I mean - - I mean, Joe's a good friend.  You're a good
friend.

**Abrahamson:**  Okay.

Berkley:  It's like - -

**Abrahamson:**  To tell you the truth - - to tell you the truth, God honest truth - -

Berkley:  Yeah.

**Abrahamson:**  - - when I saw it hit the stores, I was about to come out of my
shorts.

Chang Dec. Ex. F at 80:15-25.  This section contains an assertion by Berkley that his artwork was

"skimmed."  However, Abrahamson never confirmed that the artwork was skimmed from Berkley

or Base4.  It is true that Abrahamson seems to express surprise about appearance of the product

once it hit the stores.  Nevertheless, crediting Abrahamson's declaration, the surprise could have

been related to product, ownership, or use issues with respect to Wink's products.  Again, the

declarations of Abrahamson, Gail Onstad, and Suzanne Abrahamson indicate that Base4 did not

own either the artwork at issue.  See Abrahamson Dec. ¶¶ 24, 25; Suzanne Abrahamson Dec. ¶¶ 2,

3, 5; Onstad Dec. ¶ 2-5.

Page 97 reads in relevant part:

Berkley:  - -  at least use your own artwork.

**Abrahamson:**  I - -

Berkley:  You know what I'm saying?

**Abrahamson:**  If I paid attention to it - -

Berkley:  Yeah.

**Abrahamson:**  - - it would have never happened.  I fucked up.  I took him for his
word because I didn't get involved in it.  I was just trying to help him out.  I fucked
up.  It was my fault.  Don't blame him; blame me.

Chang Dec. Ex. F at 97:13-25.  This section suffers from the same problem as Page 80.

Abrahamson does not expressly confirm that Base4 owned the artwork, and interpretations of the

excerpt other than Berkley's are possible.  The unsworn excerpt is not sufficient to negate the

declarations of Abrahamson, Gail Onstad, and Suzanne Abrahamson.

In terms of Nowell's evidence, Berkley is asking the Court to weigh what he believes is

1  "overwhelming documentary evidence," and to not be swayed by "dubious" and "outrageous

2  accusations[s]." Doc. No. 24 at 6:19-23.  However, it is not the Court's function to weigh the

3  quality or credibility of the evidence presented.  See Gangland Prods., 730 F.3d at 957; Wilson, 28

4  Cal.4th at 821.  As credited, Abrahamson's evidence is not so insufficient or outlandish that a

5  finding of the absence of probable cause could not be reasonably made.  Makaeff, 715 F.3d at 261.

6       With respect to malice, Abrahamson's declaration indicates that Berkley would have

7  known that Abrahamson was not a Base4 employee and that Base4 did not have an ownership

8  interest in either Wink's products or artwork.  It also appears that Berkley withheld the existence

9  of Wink to the FBI.  Additionally, the FAC alleges that Berkley was involved in a conspiracy to

10  harm Abrahamson by in part by creating the threat of criminal prosecution.  This is sufficient to

11  show malice.  See Soukup v. Law Offices of Herbert Hafif, 39 Cal.4th 260, 292 (2006) (noting

12  that a malicious prosecution plaintiff must prove actual ill will or improper motive and that malice

13  can be inferred from the facts establishing a lack of probable cause).

14       Finally, with respect to a favorable termination, for malicious prosecution claims based on

15  a search warrant, the common law indicates that a favorable termination occurs when either the

16  items identified in the search warrant are not found, see Hollinshed v. Shadrick, 97 S.E.2d 165,

17  167 (Ga. App. 1957), or there has been an abandonment of proceedings, see Shaw, 245 P. at 320;

18  Restatement (Second) Torts, § 659(c).  Here, the investigation into Abrahamson is finished and

19  notably two United States Attorney's Offices have declined to bring charges.  Thus, two separate

20  federal offices have decided to abandon the matter.  Further, given that Abrahamson's evidence

21  indicates a lack of an ownership interest by Base4 in Wink's products and artwork, the fact that

22  related BB17 documents and products were found at Abrahamson's home is of questionable

23  significance.  If Base4 had no ownership interest in the Wink products or artwork, then it seems

24  that the items seized during the search would not be supportive of the crime alleged in the

25  complaint.  That is, the warrant would have produced no incriminating evidence.[13] Cf.

26

27  [13] The Court notes that California law regarding malicious prosecution requires courts to decide whether there has been a termination in the plaintiff's favor.  But, if there are disputed issues of fact, then the jury must resolve those facts before the Court determines whether there has been a favorable termination.  See Judicial Council of California, Civil Jury Instructions ("CACI"), § 1500 (2016).  The same procedure applies with respect to determining probable cause.  See Citi-Wide, 114 Cal.App.4t h at 912-13; CACI § 1500.

28

1   Hollinshed, 97 S.E.2d at 167.   At this time, Abrahamson has provided a sufficient indication of a

2   favorable termination.   See Shaw, 245 P. at 320; Restatement (Second) Torts, § 659(c); cf.

3   Hollinshed, 97 S.E.2d at 167.

4          In sum, Abrahamson has met his burden.   See Gangland Prods., 730 F.3d at 957; Wilson,

5   28 Cal.4th at 821; Shaw, 245 P. at 320.   Therefore, Berkley's SLAPP motion will be denied.

6

7   **III.   Stay Of Proceedings**

8          *Defendant's Argument*

9          Berkley argues that, in the event the Court denies his motions, a stay should be imposed

10  pending resolution of the Texas litigation.   The claims arise out of the same circumstances as the

11  Texas case, and it is possible that this Court and the Texas court could reach inconsistent results,

12  for example on the issue of whether Abrahamson was a Base4 employee.   The result of the Texas

13  litigation will affect the outcome of this case, and Berkley will certainly face delays in this action

14  while Plaintiffs are engaged in the Texas litigation.   Further, in reply, Berkley argues that the

15  factors identified in *Nakash v. Marciano*, 882 F.2d 1411 (9th Cir. 1989) all favor a stay.

16         *Plaintiffs' Opposition*

17         Plaintiffs argue that granting a stay is improper because it would violate the principles of

18  the *Colorado River* doctrine.   There is substantial doubt that the Texas litigation will be an

19  adequate vehicle for the complete and prompt resolution of the issues.   Berkley is not a party to

20  the Texas litigation, so none of the claims against him will be resolved, and the scheduling order

21  in the Texas case was severely altered by the criminal investigation instigated by Berkley.   This

22  case addresses a distinct set of events that was caused by Berkley, and a stay is not warranted.

23         *Discussion*

24         There are two bases for a stay that have been raised by the parties.   Berkley's motion

25  requests that a stay be granted under *Landis*.   However, Plaintiffs' opposition and Berkley's reply

26  invoke aspects of *Colorado River*.   *Landis* and *Colorado River* are separate doctrines.   See

27  Lockyer v. Mirant Corp., 398 F.3d 1098, 1113 (9th Cir. 2005) (noting that the opinion was not

28  intended to unduly restrict the ability of a court to issue "*Landis* stays or to issue stays under other

31

doctrines, such as *Colorado River . . . .*").  The Court will discuss each stay doctrine separately.

   1.   *Landis* Stay

   Because courts have the inherent power to control their own dockets for the purposes of promoting efficient dispositions, courts may issue temporary stays of the cases before them. Landis v. North Am. Co., 299 U.S. 248, 254 (1936); CMAX, Inc. v. Hall, 300 F.2d 265, 268 (9th Cir. 1962); see also Lockyer, 398 F.3d at 1109-13.  That is, a court "may, with propriety, find it is efficient for its own docket and fairest course of the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." Leyva v. Certified Grocers of Cal., Ltd., 493 F.2d 857, 863 (9th Cir. 1979).  In deciding whether to issue a *Landis* stay, courts must balance various "competing interests," including:  (1) the possible damage that may result from granting a stay; (2) the hardship or inequity that a party may suffer without a stay; and (3) the orderly course of justice measured in terms of simplifying or complicating issues, proof, and questions of law which could be expected to result from a stay.  See Lockyer, 398 F.3d at 1110; CMAX, 300 F.2d at 268.  The proponent of a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else."  Landis, 299 U.S. at 255.  *Landis* stays may be issued where the "separate proceedings are judicial, administrative, or arbitral in character . . . ." Leyva, 593 F.2d at 863.

   Assuming without deciding that a *Landis* stay is available in this case,[14] Berkley has not

---

[14] Courts are not uniform in either their methodology or results with respect to *Landis* stays and *Colorado River* stays in concurrent state and federal cases.  See Fishman Jackson PLLC v. Israely, 2016 U.S. Dist. LEXIS 48768, *8-*21 (N.D. Tex. Apr. 12, 2016) (discussing cases).  The Ninth Circuit has "sustained or authorized in principle" *Landis* stays in cases involving arbitration or on-going administrative proceedings. Lockyer, 398 F.3d at 1109-1112 (discussing cases).  The Court is not aware of a Ninth Circuit or Supreme Court case that has authorized a *Landis* stay when there is a parallel state case pending, and Berkley has cited none.  In *Colorado River,* the Supreme Court stated the general rule that a related and pending state court action is not a bar to proceeding in federal court.  Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).  The Supreme Court then cited *Landis* and explained, "As between federal district courts, however, though no precise rule has evolved, the general principle is to avoid duplicative litigation.  This difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." Id.  From this discussion in *Colorado River,* some courts have found that *Landis* does not apply in concurrent state-federal cases.  See Ambrosia Coal & Constr. Co. v. Morales, 368 F.3d 1320, 1328-29 (11th Cir. 2004); Schulein v. Petroleum Dev. Corp., 2012 U.S. Dist. LEXIS 191649, *25-*26 (C.D. Cal. June 25, 2012); Big O Tires, LLC v. Felix Bros., 2011 U.S. Dist. LEXIS 143087, *9-*10 (D. Colo. Dec. 13, 2011); Johnson & Johnson Vision Care, Inc. v. Kenneth Crosby N.Y., LLC, 2010 U.S. Dist. LEXIS 35175, *12-*13 (M.D. Fla. Mar. 17, 2010).  The rationale of these cases is persuasive.  However, because the issue has not been adequately briefed or

shown that one should be issued.  Berkley first argues that he will bear a burden of defending against Plaintiffs' claims in California even though the claims arise from the same facts and circumstances as the Texas litigation.  However, Berkley presents no evidence describing the burden that he will suffer, or that the burden is particularly great.  The unrebutted evidence before the Court is that Berkley has frequent dealings in California through various business ventures.  See Abrahamson Dec. (Doc. No. 15) ¶ 8.  Furthermore, there is only one claim by one Plaintiff that Berkley will have to defend.  The malicious prosecution claim is based uniquely on Berkley's conduct towards California and Abrahamson, and Berkley has not adequately demonstrated that this claim arises out of the same set of facts and circumstances as the Texas litigation.  Therefore, Berkley has not shown that he will face an unfair or undue burden by litigating in California.

Berkley also argues that this Court and the Texas court could reach inconsistent results.  However, the possibility of inconsistent results is a risk that is present every time there are two related cases proceedings in two separate courts.  Despite this inherent risk, it is well established that the general rule is that "the pendency of an action in state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction."  Colorado River, 424 U.S. at 817; Logan v. U.S. Bank N.A., 722 F.3d 1163, 1167 (9th Cir. 2013).  Without more from Berkley, the possibility of inconsistent results alone does not justify a stay at this time.

Finally, Berkley argues that he will certainly face delays in this case while Plaintiffs are engaged in the Texas litigation.  However, one sentence is the extent of Berkley's argument.  There is no elaboration and no citation to evidence or authority.  Berkley's unadorned argument is merely speculation, and it does not support a stay.

Because Berkley has not met his burden, a *Landis* stay will not issue.[15]

2.      *Colorado River* Stay

The *Colorado River* doctrine deals with the problem posed by the contemporaneous exercise of concurrent jurisdiction by state and federal courts.  Smith v. Central Ariz. Water Conservation Dist., 418 F.3d 1028, 1032 (9th Cir. 2005).  In "exceedingly rare" circumstances,

---

raised by the parties, and because Berkley has not met his burden under *Landis* in any event, the Court need not definitively decide whether *Landis* could apply in this case.

[15] The Court notes that Berkley did not address the factor of possible damage to Abrahamson.

1   *Colorado River* recognizes a "narrow exception" to the federal courts' "virtually unflagging

2   obligation . . . to exercise the jurisdiction given them." Colorado River Conservation Dist. v.

3   United States, 424 U.S. 800, 817 (1976); Smith, 418 F.3d at 1033.  If "considerations of wise

4   judicial administration, giving regard to conservation of judicial resources and comprehensive

5   disposition of litigation," *Colorado River*, 424 U.S. at 817, show that the federal case should defer

6   to the state case, then the federal court may dismiss or stay the federal action.  See R.R. St. & Co.

7   v. Transp. Ins. Co., 656 F.3d 966, 978 (9th Cir. 2011).  In deciding whether to dismiss or stay a

8   federal case in favor of a state case concerning the same subject matter, courts in the Ninth Circuit

9   are to examine eight factors:  (1) which court first assumed jurisdiction over any property at stake;

10  (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the

11  order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the

12  rule of decision on the merits;  (6) whether the state court proceedings can adequately protect the

13  rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state

14  court proceedings will resolve all issues before the federal court.  Id. at 978-79.  With respect to

15  the last factor, although "exact parallelism" is not required between the state and federal cases,

16  "the existence of a substantial doubt as to whether the state proceedings will resolve the federal

17  action precludes *Colorado River* stay or dismissal."  Id. at 982; Smith, 418 F.3d at 1033.

18       Here, a stay under *Colorado River* is not appropriate for two reasons.  First, Abrahamson

19  has not had an adequate opportunity to reply to the application of the eight *Colorado River* factors.

20  *Colorado River* was not part of Berkley's motion.  Although Abrahamson raised *Colorado River*,

21  he only argued that there was substantial doubt that the Texas litigation would resolve this case.

22  That is, Abrahamson raised only one *Colorado River* factor.  In reply, Berkley again cited to

23  *Landis* but then attempted to apply each of the eight *Colorado River* factors.  Even if the Court

24  agreed with Berkley that the last factor either favored him or was neutral, granting the stay without

25  giving Abrahamson a legitimate opportunity to address the other seven factors is not appropriate.

26  See Zamani, 491 F.3d at 997; Eberle, 901 F.2d at 818.  Second, Abrahamson has done enough at

27  this time to show substantial doubt.  There is a scheduling order in the Texas litigation, and per the

28  scheduling order, the time to add new parties appears to have expired.  See Conway Dec. ¶ 7;

34

1    Bowers Reply Dec. ¶ 11.[16] Although there is a process in place for adding new parties, the process

2    is subject to opposition.  See, e.g., Tex. R. Civ. P. 63.  There is no indication that the other parties

3    in the Texas litigation would acquiesce to adding Berkley or choose not to file an opposition.

4    Thus, the ability of Abrahamson to add Berkley as a third party defendant at this time appears

5    contingent and not certain.  Berkley's counsel also suggests that Abrahamson could file a separate

6    suit in Dallas County and then attempt to consolidate that suit with the current Texas case.

7    However, this possibility acknowledges that Abrahamson's claims are not in the Texas litigation.

8    The notion of filing a new case to be shoe-horned into an on-going case for purposes of *Colorado*

9    *River* seems novel.  Further, it is unknown whether other considerations could cause the Texas

10   court to decline consolidation.[17]  Specifically, the Texas litigation was already stayed for two years

11   pending resolution of the criminal investigation of Abrahamson, trial is set for November 2016,

12   and additional discovery would be needed with respect to Abrahamson's cause of action.  See

13   Conway Dec. ¶ 7.  Therefore, it is unclear whether the Texas court would consolidate a separately

14   filed lawsuit by Abrahamson.

15        In sum, there has been an insufficient showing that a *Colorado River* stay of this case is

16   appropriate.  See R.R. St., 656 F.3d at 982; Smith, 418 F.3d at 1033.

17

18                                          **CONCLUSION**

19        With respect to Berkley's Rule 12(b)(2) motion, Plaintiffs have not shown sufficient

20   contacts with California by Berkley as to the first, second, and third causes of action.  Instead,

21   Plaintiffs have shown that Abrahamson is a California resident and that he would suffer some

22   harm in California.  However, under *Walden* and *Picot*, that is not enough.  With respect to the

23   fourth cause of action, Abrahamson has sufficiently shown that Berkley directed his actions

24   towards California with the intention that an investigation and possible criminal proceedings occur

25

26   [16] Both parties have submitted declarations from counsel involving the Texas litigation.  Abrahamson's counsel, Conway, declares that the time to add new parties in the Texas litigation has expired.  See Conway Dec. ¶ 7. Berkley's counsel, Bowers, acknowledges that the Texas litigation is governed by a scheduling conference, but then

27   discusses that a party may seek leave of court to alter the scheduling order.  See Bowers Reply Dec. ¶ 11.  The Court finds that Bowers's failure to contradict Conway's assertion confirms that the deadline has passed.

28   [17] Berkley's Texas counsel cites two Dallas County Local Rules, but the Court has been unable to access those rules.

in California against Abrahamson.  Therefore, the Court has personal jurisdiction over the fourth cause of action for malicious prosecution, but does not have personal jurisdiction over the first, second, and third causes of action.[18]  Because the Texas litigation involves similar issues, and because there does not appear to be a sufficient common nucleus of operative facts compared with the fourth cause of action, the Court declines to exercise pendent personal jurisdiction over the first, second and third causes of action.  Therefore, the Court will dismiss the first, second, and third causes of action.

Additionally, Plaintiffs BB17 and Wong are plaintiffs only for the second and third causes of action.  Because BB17 and Wong are not plaintiffs for the fourth causes of action, the Court will dismiss BB17 and Wong from this case.

With respect to the SLAPP motion, that motion is moot as to the first, second, and third causes of action in light of the Court's rulings on the Rule12(b)(2) motion.  As to the fourth cause of action, however, Abrahamson's evidence when credited is sufficient to meet his burden.  Therefore, the Court will deny the SLAPP motion as to the fourth cause of action.

Finally, with respect to Berkley's request for a stay, Berkley has failed to show that a stay is warranted.  First, Berkley failed to meet his burden for a *Landis* stay.  Second, Abrahamson was not given a sufficient opportunity to address each of the *Colorado River* factors, and the briefing submitted to this point leads to "substantial doubt" that the Texas litigation would resolve the fourth cause of action.  Therefore, Berkley's request for a stay will be denied.


## ORDER

Accordingly, IT IS HEREBY ORDERED that:

1.     Defendant's Rule 12(b)(2) motion to dismiss the first, second, and third causes of action for lack of personal jurisdiction is GRANTED and those claims are DISMISSED;

2.     Defendant's Rule 12(b)(2) motion to dismiss the fourth cause of action is DENIED;

---

[18] With respect to the fifth cause of action for conspiracy, that is misnamed as a cause of action.  Conspiracy is not a separate claim, it is merely a method for imposing liability among co-conspirators for the torts committed pursuant to the conspiracy.  Since it is merely a theory of liability and not a separate cause of action, there is no need for the Court to dismiss it.

3.      Plaintiffs BB17, LLC and Joseph Wong are DSIMSSED from this case;

4.      Defendant's SLAPP motion is DENIED as moot as to the first, second, and third causes of

        action;

5.      Defendant's SLAPP motion as to the fourth cause of action is DENIED; and

6.      Defendant's request for a stay of proceedings is DENIED.

IT IS SO ORDERED.

Dated:   September 2, 2016                   _____

                                            SENIOR  DISTRICT  JUDGE